UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VANESSA D. BULLOCK-BANKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:03-cv-1459-DFH-TAB |
| | ) | |
| INDIANA AMERICAN WATER CO., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANT'S MOTION TO PRECLUDE AND DISALLOW

Plaintiff Vanessa D. Bullock-Banks has accused her former employer, defendant Indiana American Water Co. ("IAWC"), of racial discrimination in the termination of her employment. Bullock-Banks also claims that her supervisor harassed her because of her race and that IAWC is liable under state law for intentional infliction of emotional distress. IAWC has moved for summary judgment on all claims, and has moved to preclude evidence from a treating physician and to disallow plaintiff's 19-page list of errors in her deposition transcript.

*Summary Judgment Standard*

Summary judgment should be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of material

fact exists, the court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir. 2001). The court must also view the disputed evidence in the light reasonably most favorable to the non-moving party and must give plaintiff the benefit of all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, the non-moving party may not rest upon allegations in the pleadings. She must go beyond the pleadings and support her contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Only conflicting evidence regarding facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). And, if the non-moving party fails to establish the existence of an element essential to her case, one on which she would bear the burden of proof at trial, summary judgment is properly granted. *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996). In deciding a motion for summary judgment, the court may not weigh conflicting evidence and choose from among conflicting reasonable inferences from the evidence. However, when a party has shown that it is entitled to summary judgment, it would be a "gratuitous cruelty" to put the parties and others through the stress of a trial that could have only one outcome. See *Mason v. Continental Illinois Nat'lBank*, 704 F.2d 361, 367 (7th Cir. 1983).

*Undisputed Facts*

The following facts are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiff. Bullock-Banks began working for the Gary/Hobart Water Company as a customer service clerk in 1971. The water company changed its name to Northwest Indiana Water Company, and in 1986 Bullock-Banks was promoted to assistant customer service supervisor. She was one of two supervisors at that level in the customer service area. Her focus was on direct customer contact. The other supervisor focused more on the accounting and billing end of the department routine. Bullock-Banks is African American; the other supervisor at that same level was Caucasian.

The parent company of IAWC purchased Northwest Indiana Water Company in the fall of 1999 in order to merge it with IAWC. Most of the jobs in the Gary customer service center were to be eliminated because the customer service functions were being consolidated in Richmond, Indiana at an existing IAWC customer service site. Unlike her Caucasian counterpart, Bullock-Banks was hired by IAWC and was given a raise. She moved to Richmond so that she could serve as superintendent of the IAWC Customer Service Call Center in Richmond. Christine Doron, IAWC Vice President and Treasurer hired Bullock-Banks and assigned her to work under Crystal Lawson, who had recently become director of customer service. Two call center supervisors, Kim Spurrier and Paula Slifer were to report to Bullock-Banks. While the title "superintendent" was new, most of the responsibilities were those previously performed by the director. Lawson had

served as director for only a couple of months before IAWC hired Bullock-Banks. Lawson had replaced Melody McNeely, who had resigned after failing to improve poor performance.  Bullock-Banks was to take over the day to day supervision of customer service at the Richmond facility similar to McNeely's past role in order to free up Lawson so that she could travel and tackle more global customer service issues, though Lawson would keep the title of director.

In November and December 1999, Bullock-Banks helped wind down activity at the customer service center in Gary.  She also traveled to Richmond on a couple of occasions during that time to receive training for her new position there. Bullock-Banks lacked knowledge of the billing side of the business, as that had been the focus of the other supervisor in Gary.  In fact, she had suggested during her interview that the other Gary supervisor might have more valuable experience for the Richmond position.  However, Doron chose Bullock-Banks over the other supervisor with the belief that her customer service expertise would benefit the Richmond center.

Lawson was responsible for implementing a training program for the new service center superintendent and decided that Bullock-Banks should learn the software and call handling responsibilities first, then move on to understanding the roles of her subordinates, and finally the responsibilities of the director, so that she could assume Lawson's day to day responsibilities when she was gone. Most of her introduction to the Richmond service center and the various job

responsibilities at the center was provided by Spurrier and Slifer, though Bullock-Banks regularly communicated regarding the transition with Lawson as well. Doron, Spurrier and Slifer are all Caucasian.  Lawson, like Bullock-Banks, is African American.

During the two month transition period in 1999, Lawson began noting problems she perceived with Bullock-Banks' performance.  After the Gary center was closed and Bullock-Banks arrived in Richmond in January 2000 to complete the training and transition, Lawson noted even more problems.  Specifically, Bullock-Banks had a number of problems on the billing and accounting side of the business, which she freely admits.  Lawson, whom Bullock-Banks describes as a micro-manager, reached the conclusion that Bullock-Banks was having too many problems executing on lesser responsibilities to allow her to undertake the training to perform the director's duties in Lawson's absence.  Lawson reduced Bullock-Banks' job responsibilities, including eliminating her supervisory responsibilities over Spurrier and Slifer.  Lawson filled out a performance review of Bullock-Banks for the last two months of 1999 and gave her a score of 2 on each of four performance standards.  The ratings code for the written evaluation form contained the following scoring codes:  PR = Progressing; 1 = Not Adequate; 2 = Improvement Needed; 3 = High Standard; 4 = Distinction; and 5 = Exceptional. The evaluation form stated that a score of 2 meant that the employee's performance was "not quite as good as peers," and though most objectives may have been met there were "shortfalls that are below what the Standards of

Performance require."  A "PR" rating is described as follows:  "this rating only appropriate for an associate new to the Company or in a significantly different assignment.  Normally, this rating would apply only during the first six months in a new job."

Though Bullock-Banks continued to serve in the position of superintendent during calendar year 2000, she was never given all of the duties and responsibilities that were originally contemplated when she was hired for the position.  Lawson continued to supervise Spurrier and Slifer.  Also, Lawson communicated to Bullock-Banks a number of times that she was failing to meet Lawson's expectations with regard to work load and performance level.

Bullock-Banks complained to Doron in September 2000 that she was made to feel unwelcome at the Richmond facility.  Bullock-Banks told Doron of Lawson's constant criticism of her and how she felt isolated because of things like never being invited to go to lunch with Lawson, Spurrier or Slifer.  In short, Bullock-Banks said she thought Lawson was trying to set her up to be fired.  She did not mention anything to Doron with respect to racial discrimination or racial harassment.  Plaintiff also made no mention of any particular statements made to her that she found offensive.  Doron conveyed Bullock-Banks' feelings to Lawson. Following her meeting with Doron, Bullock-Banks felt that Lawson began acting less negatively toward her right away and that the atmosphere at work improved.  Bullock-Banks even applied and interviewed with IAWC corporate

headquarters for eventual assignment to a national customer service call center, which was being planned.

Though the atmosphere at work improved and Lawson did not criticize Bullock-Banks' performance as much following the meeting with Doron, Lawson's actual opinion of Bullock-Banks' performance did not become more positive. An incident where Bullock-Banks approved the sending of an inaccurate and extremely inflated bill to a customer caused some further negative reaction from Lawson. The most negative reaction came on May 1, 2001 when Lawson completed the written evaluation for Bullock-Banks' year 2000 performance. Lawson rated Bullock-Banks a 1 ("not adequate") on all four performance standards, criticizing her tendency to want to do things the way they were done in Gary, her untimely completion of projects, her lack of initiative and grasp of company policies, as well as poor communication between her and Spurrier and Slifer. Lawson added that she did not feel that Bullock-Banks was a team player and she did not think Bullock-Banks was trying to improve her poor performance.

As a result of this poor evaluation, Bullock-Banks was called to meet with Lawson and a representative from IAWC human resources. With input from Lawson, Doron had decided in May 2001 that Bullock-Banks' employment with IAWC should come to an end. At the meeting Bullock-Banks was asked to submit her resignation. She refused that request at the time, so IAWC terminated her employment. Later she submitted a resignation letter in an effort to retract her

previous refusal to resign.  IAWC never filled her vacant position.  In May 2004 the Richmond facility was closed and all customer service efforts were consolidated at a national call center in another state.  Lawson left the employ of IAWC when the Richmond facility closed, opting not to seek a position at the national center.

Bullock-Banks, after pursuing her administrative remedies with the Equal Employment Opportunity Commission through the filing of a charge of race and age discrimination, brought this suit in the Superior Court for Porter County, Indiana in June 2003.  The case was removed to federal district court for the Northern District of Indiana and then, upon an unopposed motion, venue was transferred to this court as a matter of convenience.  The parties previously stipulated that Bullock-Banks' age discrimination claim should be dismissed with prejudice, and plaintiff has conceded that her claim under 42 U.S.C. § 1981 is time barred.  Her federal claims of race discrimination and harassment under Title VII, as well as her state law tort claims, remain for decision.  Additional facts are noted below, keeping in mind the standard that applies to factual issues for summary judgment.

*Analysis*

I.    *Motion to Exclude and Disallow*

In opposing summary judgment, plaintiff has submitted the medical file of her treatment by Dr. Kelley Parnell, a neurologist who saw her in connection with

complaints of poor concentration and cognitive dysfunction.  IAWC has moved to exclude any testimony by Dr. Parnell.  IAWC argues that Bullock-Banks did not provide a timely expert report and that the late report did not meet the requirements of Fed. R. Civ. P. 26(a)(2).  The records address the medical relief she sought, allegedly in connection with the emotional stress or distress which she claims was intentionally visited upon her by Lawson, Spurrier, and Slifer.  The only relevance the records might have at this point is to support the damages element of the claim for intentional infliction of emotional distress.

The court is deciding IAWC's motion for summary judgment without reaching any issues for which the doctor's records or testimony would be relevant.  As explained in Part IV, plaintiff's claim for intentional infliction of emotional distress claim fails for lack of evidence of both outrageous behavior and harmful intent.  Consequently, the request to preclude Dr. Parnell's testimony or records is denied as moot.

IAWC also moves to disallow the 19 pages of changes that Bullock-Banks has made to her deposition transcript.  IAWC argues that the changes are substantive, are set forth without a sufficient reason for each change, were made only after a review of the pending summary judgment motion, and were too late under Fed. R. Civ. P. 30.  Bullock-Banks responds by indicating that her response brief was drafted before the changes were made.  She asserts that she did not refer to any of the transcript changes in the response brief.  Further, she indicates

the changes, while considerable, were made to ensure that her testimony was as truthful and accurate as possible.

Rule 30(e) of the Federal Rules of Civil Procedure allows a deposition witness the right, upon request, to have 30 days to review the transcript and to make changes as to "form or substance."  The witness may exercise this privilege by signing a statement reciting the changes and her reasons for making them.  If the witness exercises this privilege properly, both the original answers and the revised answers and the accompanying explanations become part of the record.  *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997); *Lustig v. Thomas*, 89 F.R.D. 639, 641-42 (N.D. Ill. 1981).

As Judge Will explained in *Lustig*, however, a witness who seeks to exercise this privilege must comply with the rule's requirements.  The 30-day limit in Rule 30(e) prevents abuse and surprise, and Bullock-Banks plainly missed the deadline in this case.  The record does not show exactly when the deposition transcript became available for review, but it was much more than 30 days before the changes were made.  Defendant IAWC filed parts of the deposition transcript in support of its motion for summary judgment.  The response brief was filed more than five weeks later, and by plaintiff's counsel's admission, plaintiff made the changes to the deposition transcript only after the response brief was drafted.  The changed answers are untimely under the terms of Rule 30(e) and are not available

as evidence.  Defendant's motion to disallow the changes to plaintiff's deposition transcript is hereby granted.

II.   *Racial Harassment*

To prove racial harassment under Title VII, Bullock-Banks must prove that: (1) she is a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) there exists a basis for employer liability.  *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004).  To avoid summary judgment, plaintiff must come forward with evidence that would allow a jury to find in her favor on any contested element. Where, as here, the claim is that the employee's supervisor created the hostile environment, element five is assumed.  See *Mason v. Southern Illinois Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000).  Thus, for the incidents or behavior that Bullock-Banks claims to be actionable, the motivation must have been her race. In addition, the behavior exhibited must have been so offensive as to cause her, and any reasonable person, to view her work environment as intolerably hostile or abusive.  *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998).

Bullock-Banks complains that Lawson did not provide adequate training, did not copy her on all critical managerial communications, and lunched with

Spurrier and Slifer without inviting her or making any other similar effort that might have made her feel more welcome in Richmond.  Plaintiff notes two specific instances of degrading comments she perceived to be based upon race.  The first is a statement made by Lawson that Gary, Indiana was the "murder capital of the world."  The second was Lawson's alleged reference to Bullock-Banks' children as "hoodlums."  Bullock-Banks weaves all of these statements, actions and attitudes into a conclusion that Lawson conspired with Spurrier and Slifer to make sure Bullock-Banks was either fired or felt so uncomfortable that she would leave IAWC.  According to Bullock-Banks, Lawson's motivation was that she did not want any competition from another qualified African American female.  She asserts this speculation as the basis for both her harassment and discriminatory termination claims.

The harassment claim fails for two reasons.  First, the undisputed facts show that the conduct she attributes to Lawson was not severe enough to support a claim.  Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Seventh Circuit has often said that "Title VII is not a general code of workplace civility, nor does it mandate 'admirable behavior' from employers."  *McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir. 2004).  Thus, a plaintiff must show that harassment was so severe as to alter the terms and conditions of her employment.

-12-

To ascertain whether an environment is objectively hostile or abusive, the court must consider all the circumstances, including the frequency of the discriminatory conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether that conduct unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1046 (7th Cir.2002). The two comments alleged here, neither of which had any apparent racial dimension, would not allow a reasonable jury to find that they were severe enough to support a claim. A manager's lack of effort to welcome a new subordinate to town is not enough, nor is her exclusion from private lunches. No reasonable person would consider the severity, frequency and nature of the conduct complained of to be such that her workplace became so hostile as to alter the terms and conditions of her employment. *E.g.*, *Adusumilli*, 164 F.3d at 361-62 (affirming summary judgment in sexual harassment case that lacked evidence of severe or pervasive hostility based on sex).

Second, even if Lawson's comments and conduct could be deemed severe enough to support a hostile environment claim, plaintiff has offered no evidence that she was treated negatively because of her race. The comments complained of have no root in race. Cf. *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1009 (S.D. Ind. 2004) (denying summary judgment on racial harassment case; among other incidents, white employee's threat to drag black employee behind pickup truck had clear racial dimension). The court recognizes that the

harassment need not have been explicitly racial if the harassment still had a racial purpose. *E.g.*, *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). However, the plaintiff's subjective belief that she was treated coolly because of her race is not sufficient to prove a racial purpose. Bullock-Banks has not come forward with any evidence that would allow a reasonable jury to find (as opposed to guess) that her race had any effect on Lawson's treatment of her. Bullock-Banks has not come forward with any direct or explicit evidence of any racial hostility or motivation. She offers only her own speculation, based on an assumption that Lawson either felt the company would limit the number of African-American women who advance in management or, that as an African American woman, she had an advantage over Caucasian women that she would not have over another African American. Without any supporting evidence, plaintiff's theory amounts to unsupported speculation that would not allow a jury to find racial harassment in employment.

III.     *Discriminatory Termination*

        Without direct evidence of racial discrimination, Bullock-Banks relies on the indirect method of proof. Under that method, plaintiff must first come forward with evidence of a prima facie case of race discrimination, showing that she was performing her job up to IAWC's legitimate expectations, suffered an adverse employment action, and others similarly situated who are not her race have been treated more favorably. *Williams v. Waste Management of Illinois*, 361 F.3d 1021,

1034 (7th Cir. 2004).  Once a plaintiff has established a prima facie case, the employer must produce a non-discriminatory reason for the adverse employment action.  *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).  If such a reason is given, and at least one reason invariably is given, the plaintiff must then present sufficient evidence to enable a trier of fact to find that the employer's explanation is a dishonest pretext.  *Id.*

IAWC argues that Bullock-Banks fails at the first and third steps because she was not meeting its legitimate expectations and has not provided any evidence of others similarly situated being treated more favorably.  Bullock-Banks takes issue with both arguments.

First, she maintains that she was performing up to legitimate expectations. She also contends that Lawson should never have evaluated her for 1999 because she had not yet moved to Richmond and Lawson had not personally overseen her work.  She maintains that the 2000 evaluation should have been her first.  To support her claim that she was meeting expectations, Bullock-Banks argues that Lawson was required to evaluate her as "PR" or progressing during her first year on the job and that two negative performance evaluations were required before an IAWC manager could be terminated.  Finally, she argues that Melody McNeely, a Caucasian, was similarly situated and was treated more favorably than she was.

Bullock-Banks has not come forward with evidence to support these assertions to the point that they present a genuine issue of material fact calling for trial. As a basis for asserting that Lawson inappropriately evaluated her for the last two months of 1999, Bullock-Banks points to the following: (1) McNeely's testimony that a supervisor would have to work with an employee in order to be able to evaluate that employee's performance; (2) Lawson's testimony that she kept negative notes regarding Bullock-Banks' performance on her computer, but did not do the same for others; and, (3) the written evaluation form and the IAWC *Manager's Guide for Effective Performance Management* say that "PR" or progressing is the proper evaluation code to use for the first six months or year for an employee who is new or in a significantly different assignment, not the 2 or 1 ratings she received.

Bullock-Banks twisted beyond recognition the McNeely and Lawson deposition testimony, as well as the language of the evaluation form and *Manager's Guide*. During McNeely's deposition, plaintiff's counsel gave the witness a less than complete factual background regarding Bullock-Banks' job responsibilities during the last two months of 1999 and in fact told McNeely that "Miss Banks actually was in Northwest Indiana during that time in 1999, she didn't transfer until January 2000" and "she never worked at the CSC." McNeely was then asked if she would have been able to rate her under the performance standards for those two months. Given the incomplete and arguably inaccurate facts, McNeely predictably responded that she would not have been able to

evaluate her unless she had done a job for her, and then only after checking with human resources to make sure they understood that the evaluation was based only on a more limited time period. In fact, the undisputed facts show that Bullock-Banks had been to the Richmond Service Center on more than one occasion during those two months, and that she did coordinate her transition efforts through communications with Lawson. And while Lawson did keep computer notes regarding the transition and Bullock-Banks contributions or lack thereof, the suggestion that this was somehow discriminatory is not well founded. Though not on the computer, Lawson testified that she kept written notes regarding all matters of importance to the Richmond Service Center, and any critical comments regarding Spurrier or Slifer would have been noted on the pages of a calendar she kept.

Bullock-Banks' charge that the evaluation form and *Manager's Guide* "required" that Lawson rate her as "PR" or "progressing" for at least a year is also groundless. There is no mandate in the language of the evaluation form or the *Manager's Guide*. They both say that "PR" is "only appropriate" for someone who is new or in a new assignment for six months (evaluation form) or one year (*Manager's Guide*). In other words, a manager was not required to use that code; rather, she was allowed to use it only in certain situations. Either way, Bullock-Banks' argument that she should not have been evaluated in 1999 and should have been given ratings of "PR" on her year 2000 evaluation because she did not start her actual employment under Lawson until January 2000, and her claim

that being evaluated as "PR" would have indicated that she was meeting her employers legitimate expectations, does not present a genuine issue of material fact.   The undisputed facts show that Bullock-Banks was not meeting her employer's expectations, and her deposition is ripe with admissions of her own performance problems.

For the final element of the prima facie case, Bullock-Banks claims that Melody McNeely was a similarly situated Caucasian who was allowed a year to correct her poor performance before she was terminated.   IAWC argues that McNeely was not similarly situated because she held a higher position as director of the Richmond Service Center and reported directly to Doron.   Even if they were comparably situated, IAWC argues that their treatment was nearly identical because each was given well over a year to address performance problems before she resigned or was fired.   In fact, according to IAWC, Bullock-Banks got much more feedback on her performance deficiencies and the problems that needed to be addressed then did McNeely.   The court finds that a question of fact exists as to whether plaintiff and McNeely were similarly situated, but no evidence could support a finding that McNeely was treated more favorably.

Melody McNeely had worked for the water company for 22 years, similar to Bullock-Banks' long service in Northwest Indiana for the purchased company. McNeely received her first bad performance review on May 5, 1998 for the calendar year 1997.  'When she received another bad review for 1998, she was

asked to resign.  Lawson's testimony confirms that Bullock-Banks was brought to Richmond to take over the responsibilities that had previously been McNeely's, though the title of the position was not the same.  While Bullock-Banks never completely took over all the responsibilities and had an intermediate level of supervision between her and Doron, she did take on many of the director's responsibilities.  The similar positions are sufficiently comparable for a question of fact to exist with regard to whether they were similarly situated.  However, that does not save the day for plaintiff.

Plaintiff claims that McNeely's testimony confirms that it was the policy of IAWC not to terminate someone until she had two bad performance reviews and had been allowed a year in between to correct the poor performance.  Plaintiff posits, without evidentiary support, that McNeely was given valid evaluations while her own were "fabricated."  Plaintiff then concludes her argument by maintaining that under the supposed "two bad reviews" policy, an employee must have worked for IAWC for 24 months before she could be terminated, while she was allowed only fourteen months.  If such a policy had actually existed, it would indicate extraordinary tolerance on the part of the employer, but there is no evidentiary record to support its existence.  McNeely's testimony that in her "estimation" a person could not be fired after one bad review because it was the policy of IAWC to give the person a chance to improve her performance does not equate to confirmation of a policy that a new employee is entitled to 24 months before she can be terminated for poor performance.  In fact, plaintiff can point to

no written policy or procedure and can offer no statement in any manual that even suggests that such a policy existed.  Bullock-Banks, like McNeely, had her responsibilities reduced and was given a full year following the bad review she received in May 2000 to correct her performance. She was unable to do so.  She was employed for 18 months with IAWC before she was terminated, and she was given ample warning of the nature of her performance problems.  The undisputed facts show that Bullock-Banks was not treated less favorably than McNeely. Accordingly, plaintiff's claim of racial discrimination in her termination fails as a matter of law for lack of a prima facie case.

Even if an issue of fact were presented at that stage of the case, plaintiff has not come forward with evidence that would allow a reasonable jury to find that IAWC's stated reason for firing her was a false pretext.  The non-discriminatory reason offered for firing Bullock-Banks was her poor performance over an extended period of time.  In essence, the court's determination that she was not meeting her employer's legitimate expectations doubles as a determination that the reason offered for the termination is not a pretext.  In any event, Bullock-Banks' unsupported contention that Lawson somehow conspired with Spurrier and Slifer to assure her downfall just does not pass muster.  After all, it was Doron who both hired and fired Bullock-Banks.  That fact alone is not decisive, though it tends to underscore the absence of evidence of racial discrimination. See *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745 (7th Cir. 1999) ("same actor inference" typically provides a convenient shorthand for cases in which a

plaintiff is unable to present sufficient evidence of discrimination).  There is simply no evidence creating a genuine issue of fact as to the honesty of IAWC's stated reason for terminating plaintiff.  Since there is no genuine issue of fact as to two elements of plaintiff's prima facie case or as to the issue of pretext, defendant is entitled to summary judgment on the termination claim.


IV.    *State Law Claim*

Bullock-Banks concedes in her response brief that her wrongful termination claim under state law fails as a matter of law.  That leaves the claim of intentional infliction of emotional distress as her sole remaining state law theory of recovery.  Because it is so clear that the claim has no merit, the court exercises its supplemental jurisdiction to resolve it without further litigation in the state courts.  See, *e.g.*, *Wright v. Associated Insurance Cos.*, 29 F.3d 1244, 1252 (7th Cir.1994); *Korzen v. Local Union 705, International B'hood of Teamsters*, 75 F.3d 285, 289 (7th Cir.1996) (affirming dismissal of meritless state law claim).


Under Indiana law, a claim for intentional infliction of emotional distress requires evidence that the defendant's action was taken with intent to harm and was so outrageous as to be beyond the bounds of decency.  *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991); *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. App. 2002).  Indiana courts have been reluctant to allow these claims in employment cases, and there must be some evidence of malicious and harmful

intent in order to allow such a claim to proceed to trial.  *McCreary v. Libbey-Owens Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997).  The record evidence here provides no basis for finding that Lawson, Doron, or any other agent or employee of  IAWC took actions with the intent to inflict emotional distress upon Bullock-Banks, and no reasonable jury could make such a finding.  Also, plaintiff has not identified any action that was so outrageous as to support the claim.  Plaintiff's claim for intentional infliction of emotional distress fails as a matter of law.

*Conclusion*

In light of some of the briefing, a few concluding comments are needed.  The issue is not whether plaintiff's co-workers liked or respected her, or whether her supervisor treated her courteously or warmly.  Title VII "does not guarantee a utopian workplace, or even a pleasant one."  *Patton v. Indianapolis Public School Bd.*, 276 F.3d 334, 339 (7th Cir. 2002); *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994).  Also, the issue is not whether plaintiff has a sincere belief that she was the victim of racial hostility.  The issue is whether plaintiff can produce evidence that would allow a reasonable jury to find that the conditions of her employment were substantially different because of her race, or that she was fired because of her race.  As explained above, the answer here is no. Defendant's Motion for Summary Judgment is granted.  Also, defendant's Motion to Preclude and Disallow is granted insofar as the 19 pages of changes to the deposition of Ms. Bullock-Banks are not allowed and will be stricken from the

record as untimely submitted.  The motion is denied as moot in all other respects.

A separate final judgment shall issue in favor of defendant.


        So ordered.


Date: May 12, 2005                    _____
                                      DAVID F. HAMILTON, JUDGE
                                      United States District Court
                                      Southern District of Indiana

Copies to:

Anna M. Hearn
BLACHLY TABOR BOZIK & HARTMAN
ahearn@btbhlaw.com sgasienica@btbhlaw.com

Douglas J. Heckler
BARNES & THORNBURG
dheckler@btlaw.com

F. Amin Istrabadi
BLACHLY, TABOR, BOZIK & HARTMAN
fistrabadi@btbhlaw.com